**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**RYAN TIERNEY, as the Personal
Representative of the ESTATE OF
MICHELLE TIERNEY and on
behalf of her survivors,**

       **Plaintiff,**

**vs.**                                  **Case No. 4:17cv05-WS/CAS**

**JULIE JONES, Secretary of the
FLORIDA DEPARTMENT OF
CORRECTIONS, and
CORIZON HEALTH, INC.,**

       **Defendants.**
_____/

**ORDER and REPORT AND RECOMMENDATION**

Defendants Corizon Health, Inc., Corizon, LLC, and Secretary Julie L.

Jones removed this case from state court on January 5, 2017.  ECF Nos.

1-2.  The complaint filed in state court has been separately filed as ECF

No. 6 for ease of reference.  Defendants filed answers to the complaint,

ECF Nos. 11 and 13, and the answer filed by Defendant Julie Jones in her

official capacity as Secretary of the Department of Corrections includes a

counter claim against Plaintiff pursuant to FLA. STAT. § 960.293 and

§ 960.297.  ECF No. 13 at 12-14.  At the conclusion of the discovery

period, Defendants filed a motion for summary judgment on December 4,

2017, ECF No. 28, followed by a "corrected motion for summary judgment,"

ECF No. 31, on December 21, 2017.  Plaintiff has filed a response in

opposition to Defendants' summary judgment motion, ECF No. 33, with a

motion for judicial notice, ECF No. 33, filed shortly thereafter.  The motion

is opposed by the Defendants, ECF No. 34, within their reply to Plaintiff's

response.

**Motion for Judicial Notice, ECF No. 33**

Plaintiff has requested the Court take judicial notice of five

newspaper articles which were attached as Composite Exhibit 1 to the

motion, ECF No. 33, and three newspaper articles[1] which were submitted

as Composite Exhibit 1 to the response, ECF No. 32-1, along with an

article from the Florida Justice Institute.  Plaintiff contends that the Court

may take judicial notice of these exhibits pursuant to Federal Rule of

Evidence 201(b)(2).  ECF No. 33 at 2.  Plaintiff states that "the attached

---

[1] These articles were from the Miami Herald, ECF No. 32-1 at 1-5; the Sun
Sentinal, ECF No. 32-1 at 10-13, and the Palm Beach Post, ECF No. 32-1 at 14-15.
Another article is referenced as being from "www.floridajusticeinstitute.org," ECF No.
32-1 at 6-9, although that is not a newspaper publisher but a nonprofit public interest
law firm.

news articles fall squarely within the category of documents that have been recognized by courts as appropriate for judicial notice."  ECF No. 33 at 2 (citing <u>Osheroff v. Humana Inc.</u>, 776 F.3d 805 (11th Cir. 2015).

Rule 201 permits a court to "judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  The newspaper articles which were judicially noticed in <u>Osheroff</u> were for the purpose of determining whether the "public disclosure bar" prohibited a qui tam lawsuit.  776 F.3d at 813.  In other words, the court was asked to take judicial notice of the *fact* that information had been disclosed to the public; it was not asked to determine the *truth* of the information presented.

Here, at the summary judgment stage of litigation, Plaintiff is requesting this Court take judicial notice of "facts" which are stated in the publications.  It is a request that "bypasses the safeguards which are involved with the usual process of proving facts by competent evidence in district court."  <u>Shahar v. Bowers</u>, 120 F.3d 211, 214 (11th Cir. 1997).  That is so because the newspaper articles and publication of the Florida Justice

Institute do not state the "the kinds of things about which courts ordinarily take judicial notice" such as: "(1) scientific facts: for instance, when does the sun rise or set; (2) matters of geography: for instance, what are the boundaries of a state; or (3) matters of political history: for instance, who was president in 1958." Shahar, 120 F.3d at 214.  A cursory review of Plaintiff's two Composite Exhibit 1's leads to the conclusion that they do not present matters of scientific fact, geography, or political history, they present matters of opinion.  Furthermore, most of the exhibits do not pertain to the events at issue in this case concerning the medical care provided to Michelle Tierney, or to the medical care generally provided at Lowell Correctional Institution.  The exhibits[2] do not present facts which

---

[2] All of the publications presented in Composite Exhibit 1, filed with the response, ECF No. 32-1 at 1-15, were also included in the motion for judicial notice.  ECF No. 33-1 at 7-21. However, the exhibit filed with the motion, ECF No. 33-1, contained an additional publication.  The first publication of Composite Exhibit 1, filed as ECF No. 33-1, pertained to lawsuits filed against Corizon, but concerns issues in New Mexico, Georgia, Michigan, Oregon, Arizona, California, and Indiana, not within Florida.  ECF No. 33-1 at 1-6.  That article was not included in the exhibits filed with the response, ECF No. 32.  The second publication (an article from the Miami Herald) mentioned medical care at Lowell in general, ECF No. 33-1 at 7-11; ECF No. 32-1 at 1-5, but was not specific as to either Ms. Tierney or her medical needs.  The third publication concernws a lawsuit filed by the Florida Justice Institute which alleged that necessary hernia surgeries were not being provided by Corizon, but there is no mention of Lowell C.I., and this case does not concern a hernia.  ECF No. 33-1 at 12-15; ECF No. 32-1 at 6-9.  The final two publications concerned Corizon's termination of its contract with the Department of Corrections, but did not provide information on health care at Lowell C.I. ECF No. 33-1 at 16-21; ECF No. 32-1 at 10-15.  None of this information is appropriately considered as "evidence" to be relied on at summary judgment as it may

"can be accurately and readily determined from sources whose accuracy

cannot reasonably be questioned."  The exhibits may not be judicially

noticed, nor have they been shown to be particularly relevant.  For all these

reasons, Plaintiff's motion for judicial notice, ECF No. 33, is denied.

**The Complaint**

As noted above, this case was initiated in state court on December 9,

2016, but removed to this Court on January 5, 2017.  ECF No. 5 (citing to

ECF No. 1).  Jurisdiction exists over this case under 28 U.S.C. § 1331 and

28 U.S.C. § 1441 because the complaint raises an Eighth Amendment

claim pursuant to 42 U.S.C. § 1983.  ECF No. 5 at 1 (citing ECF No. 1 at

2).  The complaint presents three claims against two Defendants.  ECF No.

6.  First, count I is a medical negligence claim brought against Corizon,

seeking damages as permissible under Florida's Wrongful Death Act, FLA.

STAT. § 768.16, *et seq.*  ECF No. 6 at 7-8.  Count II is a "vicarious liability

claim" brought against Defendant, the Department of Corrections, for

actions taken by its agent, Corizon.  *Id.* at 9.  Again, Plaintiff seeks "all

damages allowable under the Wrongful Death Act, Florida Statutes,

---

not be judicially noticed under Rule 201.

Case No. 4:17cv05-WS/CAS

§ 768.16, *et seq.*  *Id.*  Finally, Count III asserts a claim under 42 U.S.C.

§ 1983 for violating Michelle Tierney's Eighth Amendment rights.  *Id.* at 10-

12.

Michelle Tierney was incarcerated in the custody of the Florida

Department of Corrections.  ECF No. 6 at 2.  At the time of her death on

October 9, 2014, Ms. Tierney was housed at Lowell Correctional Institution.

*Id.*  The complaint alleges that Ms. Tierney's death was caused by "the

negligent or otherwise tortious conduct" of Defendant Corizon's employees

and/or agents.  *Id.* at 5, 7-8.  This action was brought by Ryan Tierney, the

personal representative and son of Ms. Tierney.  *Id.* at 2, 9.

**Legal standards governing a motion for summary judgment**

"The court shall grant summary judgment if the movant shows that

there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Thus,

summary judgment is proper "after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to establish

the existence of an element essential to that party's case, and on which

that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett,

477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  The

"party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp., 477 U.S. at 323, 106 S. Ct. at 2553.  The non-moving party must then show[3] though affidavits or other Rule 56 evidence "that there is a genuine issue for trial" or "an absence of evidence to support the nonmoving party's case."  *Id.* at 325, 106 S. Ct. at 2554; Beard v. Banks, 548 U.S. 521, 529, 126 S. Ct. 2572, 2578, 165 L. Ed. 2d 697 (2006).

 An issue of fact is "material" if it could affect the outcome of the case. Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted).  Additionally, "the issue of fact must be 'genuine'" and the non-moving party "must do more than simply show that

---

[3] "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998) (quoting Celotex, 477 U.S. at 324, 106 S. Ct. at 2553) (quoting Fed. R. Civ. P. 56(c), (e))).  The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c).  Owen, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (other citations omitted).  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." <u>McCormick v. City of Fort Lauderdale</u>, 333 F.3d 1234, 1243 (11th Cir. 2003) (quoting <u>Chapman v. AI Transp.</u>, 229 F.3d 1012, 1023 (11th Cir. 2000)).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." <u>Anderson</u>, 477 U.S. at 249, 106 S. Ct. at 2511 (noting that a "scintilla of evidence" is not enough to refer the matter to a jury).  The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Hickson Corp.</u>, 357 F.3d at 1260 (quoting

Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986)).  All "justifiable inferences" must be resolved in the light most favorable to the nonmoving party, Beard, 548 U.S. at 529, 126 S. Ct. at 2578 (noting the distinction "between evidence of disputed facts and disputed matters of professional judgment."),[4] but "only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (quoted in Ricci v. DeStefano, 557 U.S. 557, 586, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S. Ct. at 1356 (other citation omitted).

---

[4]  Noting that deference must be given "to the professional judgment of prison administrators," the Court stated that "[u]nless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage."  Beard, 548 U.S. at 530, 126 S. Ct. at 2578 (citing Overton v. Bazzetta, 539 U.S. 126, 132, 123 S. Ct. 2162, 2167, 156 L. Ed. 2d 162 (2003)).

**The relevant Rule 56(e) evidence**

Michelle Tierney entered the Department's custody on September 23, 2003, to serve a 15 year prison sentence.  ECF No. 31-3 at 17-18; ECF No. 31-4 at 187.  She had an initial physical examination at Lowell Correctional Institution.  ECF No. 31-3 at 28.  Ms. Tierney completed a Department of Corrections' Health Assessment questionnaire, listing her current medical problems as: arthritis, myasthenia gravis,[5] psoriasis,[6] and allergies (hay fever).  *Id.* at 27.  Dr. J. Williams, Senior Physician, conducted an initial physical evaluation of Ms. Tierney and obtained her medical history.  ECF No. 31-3 at 27-31.  The result of the physical evaluation by Dr. Williams was "normal."  *Id.* at 29-30.

On the morning of August 29, 2014, Ms. Tierney reported to the "E/R" complaining about a "painful draining skin lesion" on her "back upper thigh by panty line."  ECF No. 31-3 at 65-66.  She was evaluated by LPN Dixon

---

[5] "Myasthenia gravis is a chronic autoimmune neuromuscular disease that causes weakness in the skeletal muscles, which are responsible for breathing and moving parts of the body, including the arms and legs." www.ninds.nih/gov.Disorders/Patient-Caregiver-Education/Fact-Sheets/Myasthenia-Gravis-Fact-Sheet.

[6] "Psoriasis is an immune-mediated disease that causes raised, red, scaly patches to appear on the skin.  It typically affects the outside of the elbows, knees or scalp, though it can appear on any location."  www.psoriasis.org/about-psoriasis.

at 10:25 a.m.  *Id.* at 65-66.  Ms. Tierney reported her pain level to be at an 8 on a scale of 0-10.  *Id.*  The medical record reflects that the lesion was actively draining pus.  *Id.*  She said that a "pimple appeared on Monday," August 25th.  *Id.* at 66.  She said that she squeezed it and the area now appeared to be twice the size and was draining.  *Id.*

The record notes that the area was "warm" to the touch and painful to touch and when walking.  *Id.*  The abscesses protocol form indicates that area was actively draining pus at the time.  *Id.* at 65.  LPN Dixon noted that her temperature was 97.7, pulse 77, oxygen saturation was 100%, respiration was 20, and her blood pressure was 123/77.  *Id.* at 65.  She instructed Ms. Tierney not to squeeze the lesion and to avoid touching the affected area without washing her hands first.  *Id.* Ms. Tierney was to be referred "to DWL"[7] further evaluation, *Id.* at 66, but the medical record does not otherwise reflect that she was provided treatment at that time or that a treatment plan was made.  *Id.* at 65.

At 10:33 a.m. that same day, Physician's Assistant Aaron Scoggins also examined Ms. Tierney.  *Id.* at 64.  He noted an abscess to the left

---

[7] That abbreviation was not explained, but it presumably means that she was to be referred to the physician on call.  In this case, she was examined by Physician's Assistant Scoggins.  *See* ECF No. 31-3 at 64, 66.

lower extremity with drainage, and ordered wound care.  *Id.*  He also

ordered Septra DS[8] two times per day.  ECF No. 31-4 at 206.

The medical record shows that dressing changes were performed

daily between August 29, 2014, and September 1, 2014.  ECF No. 31-3 at

103-104, 203-204; ECF No. 31-3 at 103-104.  It further appears that

bacitracin was applied, ECF No. 31-3 at 104 and 204, and the wound was

cleansed with saline.  ECF No. 28-6 at 3.  The record indicates a

prescription for Septra DS was written (*see* ECF No. 31-4 at 206, ECF No.

31-5 at 80), but there is nothing in this record to demonstrate that

Ms. Tierney ever received the prescribed antibiotic.  *See* ECF No. 32-3 at 5

(expert report of Michael T. Puerini); ECF No. 31-3 at 105-106; ECF No.

31-3 at 205-206.[9]

The medical record reflects that on September 1, 2014, Ms. Tierney

was seen in wound care and a white pustulent discharge was noted.  ECF

No. 31-3 at 64.  It was also noted that the wound was painful to the touch.

---

[8] Septra DS "is an oral antibiotic prescribed to treat infections, such as the infection from which Ms. Tierney was suffering."  ECF No. 32 at 4, n.5.

[9] The Medication and Treatment Record reflects what medications were given to Ms. Tierney, and when.  *See*, *e.g.*, ECF No. 31-3 at 205-206.  The most recent list of medications given was in August 2014.  *Id.*  There is not a Treatment Record for September or October and the record for August does not indicate Ms. Tierney ever received the antibiotic Septra DS.  *Id.*

*Id.*  The record does not indicate that any treatment was provided to
Ms. Tierney that day beyond the dressing change.

There is also no indication from this record that Ms. Tierney sought
any further medical care until October.  On October 6, 2014, at 2:00 p.m.,
Ms. Tierney returned to the clinic complaining of a "body ache" on her right
side.  ECF No. 31-3 at 63.  She also said that her hands were shaking and
her fingertips felt numb.  *Id.*  She said that she had "been like [that] for 3
days," and said she could "barely walk."[10]  *Id.*  The examining nurse
indicated Ms. Tierney's hands were 'trembling a little."  *Id.*  Her blood
pressure was 102/55, pulse was 100, respirations 20, and her temperature
was 100.5.  *Id.*

The record notes that Dr. Rodriguez was notified of Ms. Tierney's
"mild temperature" and he ordered that she be given Tylenol.  *Id.* at 63; *see
also* ECF No. 31-6 at 3.  She was also provided a "bed rest lay-in" pass
and a "low/bottom bunk" pass.  ECF No. 31-3 at 60.  There is a notation
indicating her temperature would be rechecked in 30 minutes.  *Id.* at 63.  At

---

[10]  A belated entry in the medical records (dated October 9, 2014) stated that she
was brought to the clinic by another inmate who pushed Ms. Tierney's wheelchair.  ECF
No. 31-3 at 61.

3:00 p.m., approximately one hour later, her temperature had decreased slightly to 99.6.  *Id.; see also* ECF No. 31-3 at 61.

On October 7, 2014, at 1:30 a.m., Ms. Tierney returned to the clinic with the same complaints.  *Id.* at 63.  At that time, her blood pressure was 92/59, pulse was 104, temperature 99.6, respirations 17, and oxygen sats were 95%.  *Id.*  She complained of not being able to sleep due to shaking and muscle aches.  *Id.*  She was again provided Tylenol and antihistamine for her symptoms.  *Id.*

Ms. Tierney returned to the infirmary clinic for a third time on October 8, 2014, at 6:20 a.m.  *Id.* at 63.  She complained of increased weakness and tiredness during the past week.  *Id.*  Her blood pressure was 92/62, pulse 121, respirations 18, oxygen sats were 85%, and her temperature was 98.2.  *Id.*  The medical record indicates she was having difficulty walking and needed assistance.  *Id.*  She was noted to be awake, alert, and oriented, and a pulse was present.  *Id.*  Her lower extremities were weak.  *Id.*  She reported a decreased appetite, but had been taking fluids. *Id.*  Dr. Rodriguez was called and notified of Ms. Tierney's condition and orders were given for Physician's Assistant Scoggins to see her upon his arrival at 7:00 a.m.  *Id.* at 62-63.

Case No. 4:17cv05-WS/CAS

P.A. Scoggins evaluated Ms. Tierney at 7:10 a.m on October 8, 2014. ECF No. 31-3 at 62.  Her blood pressure was 88/46, heart rate 130, oxygen sats 100% on 2.5 liters of oxygen.  *Id.*  Mr. Scoggins found that her lungs were clear to auscultation, but her heart rate had increased.  *Id.*  She reported inability to ambulate and bilateral lower extremities were cool to touch with decreased sensation and capillary refill.  *Id.*  She had tenderness to palpation of the lower spine and abdomen.  *Id.*  Abdomen was soft.  *Id.*  His assessment included bilateral lower extremity weakness and decreased circulation.  *Id.*  He also noted that Ms. Tierney had been returning to medical for 3 days with the same complaints.  *Id.*

At 7:25 a.m., Mr. Scoggins directed that Ms. Tierney be sent to the emergency room via EMS.  *Id.*  At that time, her heart rate was 125-129, oxygen sats 95%-100% on 2.5 liters of oxygen, and her blood pressure was 87/46.  *Id.*

Ms. Tierney was transferred to the hospital by ambulance in an "unstable" condition.  ECF No. 31-3 at 201.  The transfer record notes that she was found in her bed with "mottled extremities," "cyanosis to nailbeds," and shallow respirations.  *Id.*; *see also* ECF No. 31-5 at 108.

Ms. Tierney arrived at the Ocala Regional Medical Center at 7:40

a.m.  *ECF No. 31-6 at 3.*  Her history and physical was completed by

Dr. Abhinav Khanna.  ECF No. 31-5 at 112.  Ms. Tierney said that she had

"not been feeling well" for the past 3 or 4 days.  ECF No. 31-5 at 112.  She

reported "having severe excruciating back pain to the extent that she [had]

not been able to ambulate for the last 2 or 3 days."  *Id.*  She reported poor

oral intake, but denied any weight loss, dysuria, hematuria, constipation, or

diarrhea.  *Id.*  She also denied having numbness or tingling or "loss of

sensations," although the doctor noted from her records that she "was

noticed to have cyanosis of her fingers as well as toes" when she was sent

to the E.R. from the prison.  *Id.*  She reported some shortness of breath,

but denied any fever or chills.  *Id.*

The doctor's physical examination notes reflect that she had "cold

clammy extremities" and cyanosis was "present in the toes of her hand and

some mild cyanosis in the lower extremities too."  ECF No. 31-5 at 113.

Her temperature was 90.8, heart rate 114, respiratory rate 18, blood

pressure 109/57, 100% on room air."  *Id.*  She was alert and oriented, but

was not able to move her lower extremities, although sensations were

present.  *Id.*  She could "move her upper extremities with no loss of

sensation." *Id.* Her reflexes were "somewhat diminished," but with no loss of sensations and distal pulses were present. *Id.* at 113-114. She had "diminished breath sounds particularly at the lung bases," and tachycardia was present. *Id.* at 113.

Laboratory studies were reviewed and revealed a low white blood cell count at 3.6, low platelet count at 83, electrolytes, hemoglobin and hematocrit levels were normal. ECF No. 31-5 at 113. A CT scan of the abdomen and pelvis showed a "simple cyst at the dome of the liver" and a "nodule in the left adrenal gland of around 1.5 cm." *Id.* There was a "fatty left inguinal hernia" and "a questionable subtle stranding of the fat adjacent to the spine and iliopsoas complex." *Id.* A CT scan of the chest showed "bilateral lung infiltrates" and "some right perihilar lung consolidation." *Id.* The abdominal series showed "bilateral interstitial infiltrates." *Id.*

Dr. Khanna's impression included "sepsis due to pneumonia, elevated troponins possibly non-STEMI, leukocytopenia, thrombocytopenia, metabolic acidosis, hypokalemia, acute renal failure, abnormal liver function test, pneumonia, 4 cm hepatic cyst, 1.4 cm adrenal nodule of indeterminate significance, and lower extremity weakness." ECF

No. 31-5 at 114.  Dr. Khanna admitted Ms. Tierney and started her on broad spectrum antibiotics and IV fluids.  *Id.*  An MRI of her lumbar spine was ordered to "rule out any epidural abscess."[11]  *Id.*  The record noted that she was "at risk of going into septic shock."  *Id.*  Thus, an infectious disease and hematology evaluation was requested.  *Id.*  Her prognosis was "extremely guarded" as she was "presenting with a complicated situation." *Id.*

Consulting phsucial Michael Usberghi noted that in the emergency room, Ms. Tierney "was found to have lactic acid level of 11."  ECF No. 31-5 at 119.  "Her initial blood pressure was maintained, but she appeared mottled and" Dr. Usberghi called in Dr. Seevaratnam to evaluate her condition.  The record reflects that Ms. Tierney was "mottled" and awake, but "very lethargic."  *Id.*  Ms. Tierney was intubated, given 4 liters of fluid bolus, but her lactic acid remained "high."  *Id.*; *see also* ECF No. 31-5 at 155.  Dr. Seevaratnam's impression was that she was in "septic shock." ECF No. 31-5 at 120.  "The source could be from the lungs."  *Id.*  She had "patchy infiltrates, but did not have much respiratory symptoms prior to"

---

[11] The MRI of the lumbar spine was "normal for edema of the ileal psoas muscle complexes right treater than left."  ECF No. 31-5 at 117.  There was no "obvious loculated pocket of fluid," and infection was suspected.  *Id.*

arriving at the hospital.  *Id.*  "She also complained of abdominal pain and severe back pain, and intra-abdominal pathology needs to be ruled out also given her high lactic acid levels."  *Id.* at 120-121.  Dr. Seevaratnam found that her "source of sepsis [was] not very clear."  *Id.* at 121.  The diagnosis was acute respiratory failure secondary to sepsis, acute renal failure, and thrombocytopenia likely due to sepsis."  *Id.*

Ms. Tierney "was admitted to ICU and there was a decline in her condition . . . ."  ECF No. 31-5 at 109.  "Overnight, there was a rapid decline in her blood pressure and she required pressor support also."  *Id.* Ms. Tierney was seen by numerous doctors, including carciology, neurology, general surgery, and infectious disease, among others.  *Id.* "Despite aggressive treatment," Ms. Tierney experienced a "progressive decline in her condition."  *Id.*

On October 9, 2014, at approximately 9:00 a.m., Ms. Tierney's condition declined rapidly and she suffered a cardiac arrest.  ECF No. 31-5 at 148.  A "code blue was called as [Ms. Tierney] went into asystolic."  *Id.* at 109.  Three doctors were present at her bedside, but despite aggressive resuscitation efforts, they were unable to revive Ms. Tierney.  *Id.*

Ms. Tierney was declared dead on October 2, 2014, at 9:20 a.m.[12]  *Id.*; *see also* ECF No. 31-5 at 179.

An autopsy was conducted on October 10, 2014, at 6:30 a.m. by Medical Examiner, Dr. Barbara Wolf.  ECF No. 31-5 at 168.  The cause of death for Ms. Tierney was listed as myocarditis and her death was found to be "natural."  *Id.*  The autopsy findings included myocarditis; patchy acute pneumonia; pulmonary congestion and edema; aortic atherosclerosis, mild; nephrosclerosis, mild; acrocyanosis; hepatic cyst; and osteoarthritis of the lumbar spine.  ECF No. 31-5 at 168.  Later testing of Ms. Tierney's blood culture revealed it was "positive" for two types of bacteria: citrobacter farmeri and staphylococcus aureus (MRSA).  *Id.* at 176.  A post-mortem lung swab also revealed "heavy growth" of candida glabrata and "light growth" of staphylococcus aureus (MRSA).  *Id.* at 177.

The Expert Report of Dr. Michael T. Puerini was submitted by Plaintiff.  ECF No. 32-2.  Dr. Puerini states that when properly treated, "a staph aureus skin infection will resolve completely, and usually does not cause complications."  ECF No. 32-3 at 5.  "Extreme complications and

---

[12] A notation in the record reveals that Plaintiff's projected date to be released from prison was October 30, 2014.  ECF No. 31-4 at 198; ECF No. 31-5 at 61.

death from methicillin resistant staph aureus bacteremia and sepsis are preventable if the illness is recognized and treated promptly." *Id.* at 6. He concludes that "Ms. Tierney's death from myocarditis due to methicillin resistant staph aureus sepsis was preventable." *Id.* His report asserts that Ms. Tierney showed "early signs of methicillin resistant staph aureus bacteremia when she was first seen by nursing staff at [Lowell Correctional Institution] on October 6, 2014." *Id.* at 5. Dr. Puerini concluded that the nursing staff failed to properly evaluate Ms. Tierney's "complaints of inability to walk, fever with chills, hypotension, and tachycardia" and "missed" the chance to save her life. *Id.* at 5-6. He asserts that "staff at the Lowell Correctional Institution failed to recognize the seriousness of Ms. Tierney's early symptoms." *Id.* at 6. He states that "[t]he health care staff at the Lowell Correctional Institution delivered substandard, essentially non-existent health care." *Id.* Dr. Puerini concluded that "Ms. Tierney died as a direct result of the abysmal health care at LCI." *Id.*

The Expert Report of Dr. Kim Edward LeBlanc was submitted by Defendants. ECF No. 31-6. Dr. LeBlanc reaches a contrary conclusion, that is, "Ms. Tierney was not displaying signs of sepsis." ECF No. 31-6 at 5. The report asserts that Ms. Tierney's symptoms at LCI "were non-specific

and viral-like." *Id.* Dr. LeBlanc states that Ms. Tierney's "complaint of inability to walk would not be an indication of sepsis." *Id.*

## Analysis

### A.   Presuit Notice

The Department of Corrections requests summary judgment be granted as to the vicarious liability claim (count II) brought against it on the basis that Plaintiff did not "meet the pre-suit notice requirements of Fla. Stat. 766.106(2)." ECF No. 31 at 16. It is argued that "[t]imely written notice under the statute of the intent to initiate litigation is a condition precedent to maintaining an action for medical negligence or malpractice," and that Plaintiff "failed to do [so] with regard to FDOC." ECF No. 31 at 16-17.

In response, Plaintiff states that a "presuit Notice of Intent to Initiate Litigation ("NOI")" was delivered to the Department of Corrections "and the Florida Department of Financial Services on April 28, 2016." ECF No. 32 at 8 (citing ECF No. 32-3, Plaintiff's Composite Ex. 3]). That exhibit includes a "notice of intent to initate [sic] litigation for medical malpractice/wrongful death." ECF No. 32-3 at 1. Enclosed with the notice was a copy of the verified medical opinion of Dr. Michael Puerini, M.D.,

pursuant to FLA. STAT. § 766.106(2)(a),[13] an authorized release form, and a request for information.  *Id.*  Plaintiff submitted a copy of a certified mail receipt which indicates that delivery was made on May 6, 2016, to the Florida Department of Corrections, Lowell Correctional Institution, "attn: Risk Management," in Ocala, Florida."  ECF No. 32-3 at 17.  Moreover, the Expert Report submitted by Defendants with their summary judgment motion shows that Dr. LeBlanc reviewed the "Notice of Intent dated 4/28/16" when preparing her report.  ECF No. 31-6 at 1.  Accordingly, Plaintiff gave the required pre-suit notice prior to case initiation on December 9, 2016.[14]  The motion for summary judgment as to Count II should be denied.[15]

## B.    § 1983 Claim against Corizon

---

[13] That statute requires the completion of a "presuit investigation pursuant to s. 766.203(2) and prior to filing a complaint for medical negligence, a claimant shall notify each prospective defendant by certified mail, return receipt requested, of intent to initiate litigation for medical negligence." FLA. STAT. § 766.106(2)(a).

[14] The statute also provides that  "[n]o suit may be filed for a period of 90 days after notice is mailed to any prospective defendant."  FLA. STAT. § 766.106(3)(a). Plaintiff complied with that provision as well because the notice was mailed in April and this case was not initiated in state court until December.

[15] The summary judgment motion did not argue the merits of this claim.

Count III of the complaint asserts a claim under 42 U.S.C. § 1983 for violating Michelle Tierney's Eighth Amendment rights.  *Id.* at 10-12. Plaintiff alleged that Corizon "promulgated and endorsed written and unwritten policies and customs, and procedures that resulted in a violation of Michelle Tierney's constitutional rights."  ECF No. 6 at 10.  The complaint alleged that Corizon had a policy and practice of failing to provide adequate and necessary medical care to prisoners which "directly and proximately caused Michelle Tierney's death . . . ."  *Id.* at 10-11.

The Eighth Amendment of the United States Constitution requires that prisoners be provided treatment for their serious medical needs. Failing to provide treatment because a defendant is "deliberately indifferent" to a prisoner's plight results in cruel and unusual punishment. Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).  "A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003) (quoted in Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2011)).  It is undisputed that Ms. Tierney had a serious medical need.

However, Defendants contend that there "is absolutely no evidence that any policies, customs or procedures of Corizon were the moving force behind any constitutional violation of Ms. Tierney's right."  ECF No. 31 at 13.

> To establish deliberate indifference, a plaintiff must prove "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." *Townsend v. Jefferson Cnty.,* 601 F.3d 1152, 1158 (11th Cir. 2010) (quotation omitted). Medical treatment violates the Eighth Amendment only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Harris v. Thigpen,* 941 F.2d 1495, 1505 (11th Cir. 1991) (quotation omitted). Incidents of negligence or malpractice do not rise to the level of constitutional violations. *Id.* Claims concerning the doctor's medical judgment, such as whether the doctor should have used another form of medical treatment or a different diagnostic test, are inappropriate claims under the Eighth Amendment. *Adams v. Poag,* 61 F.3d 1537, 1545 (11th Cir. 1995).

Wallace v. Hammontree, 615 F. App'x 666, 667 (11th Cir. 2015).

In this case, the § 1983 claim for deliberate indifference is not against the individuals who provided medical care to Ms. Tierney at the institution. Instead, Plaintiff sues Corizon, a health care company who had, at the time of the events at issue, had a contractual relationship with the Florida Department of Corrections "to provide comprehensive, adequate, necessary, and reasonable medical and mental healthcare services" to

Case No. 4:17cv05-WS/CAS

Florida's prisoners.  *See* ECF No. 6 at 3.  Such a claim is permissible

under § 1983, but a plaintiff must show that the health care company or

municipality that operates the health care system had a "custom or policy

that constituted deliberate indifference to that constitutional right."

McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004) (quoted in Fields

v. Corizon Health, Inc., 490 F. App'x 174, 181 (11th Cir. 2012)); *see also*

Owen v. Corizon Health Inc., 703 F. App' 844, 849 (11th Cir. 2017) (holding

that "in order to hold Corizon liable based on its policy, [the prisoner] would

have to show the policy led to the violation of his constitutional rights.").  "[A]

municipality or entity like [Corizon] is liable only where its custom or policy

causes the constitutional injury.  Fields, 490 F. App'x at 182 (citing

AFL–CIO v. City of Miami, 637 F.3d 1178, 1187 (11th Cir. 2011)).

Here, Plaintiff had presented no evidence of any custom or policy of

Corizon.  There is no evidence that Corizon had a policy to delay transport

to a hospital, to not provide antibiotics which were ordered, or to "refuse" to

provide medical care.  Plaintiff's response to Defendants' summary

judgment motion asserts several times that "Defendants refused to treat

the infection that was ravaging Ms. Tierney's body."  ECF No. 32 at 5-6.  It

was argued that per "their practice, Defendants again refused to treat

Ms. Tierney's symptoms." *Id.* at 6.  Those assertions are not supported by

the record evidence.  There is no evidence of any policy or custom of

Corizon.  Plaintiff did not produce one piece of documentary evidence to

show any policy of Corizon.  No manual or policy book was provided.  No

testimony of medical staff was submitted to explain a custom.  This claim is

unsupported as newspaper articles do not provide competent or substantial

evidence of a policy or custom.  Summary judgment should be granted in

favor of Corizon as to Count III.

In light of this recommendation, it would be appropriate to decline to

exercise supplemental jurisdiction over the remaining claims and remand

this case back to state court.  The notice of removal asserted that

jurisdiction was appropriate because "the Complaint expressly allege[d]

violations of Plaintiff's Eighth Amendment Rights and 42 U.S.C. § 1983 in

Count III."  ECF No. 1 at 2.  The remainder of the claims (Counts I and II)

are premised solely on state law.

> A district court has original jurisdiction over claims "arising
> under the Constitution, laws, or treaties of the United States."
> 28 U.S.C. § 1331. When a district court has original jurisdiction
> over some claims, it "shall have supplemental jurisdiction over
> all other claims that are so related to claims in the action within
> such original jurisdiction that they form part of the same case or
> controversy."  *Id.* § 1367(a).  A district court "may decline to

> exercise supplemental jurisdiction" over state law claims when, among other things, it has "dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c)(3) (emphasis added). "A district court therefore has the discretion to continue to exercise jurisdiction over state law claims in a case even after dismissing the federal claim that created the original jurisdiction." *Pintando v. Miami-Dade Hous. Agency*, 501 F.3d 1241, 1242-43 (11th Cir. 2007) (per curiam).

Bravo v. Loor-Tuarez, 727 F. App'x 572, 576-77 (11th Cir. 2018).  The

decision of whether to exercise supplemental jurisdiction over remaining

state law claims is within the Court's discretion.  Mergens v. Dreyfoos, 166

F.3d 1114, 1119 (11th Cir. 1999) (cited in Raney v. Allstate Ins. Co., 370

F.3d 1086, 1089 (11th Cir. 2004)).  The Eleventh Circuit has "encouraged

district courts to dismiss any remaining state claims when, as here, the

federal claims have been dismissed prior to trial."  L.A. Draper & Son v.

Wheelabrator-Frye, Inc., 735 F.2d 414, 428 (11th Cir. 1984) (cited in

Raney, 370 F.3d at 1089).  That is especially true in this case where the

case was initially filed in state court, and the state law claims will be

resolved independently from the federal claims.  Although the claims were

related, they stand on their own.

Furthermore, the remaining issues are more appropriately addressed

in state court because they involve, at least as demonstrated by the

parties, a "complex issue of State law."  28 U.S.C. § 1367(c)(1).  Count I of

the complaint was brought against Corizon.  Plaintiff claimed that Corizon,

through its agents and employees, was negligent and as a result of such

negligence, Ms. Tierney died.  ECF No. 6 at 7-8.  Corizon argues in its

summary judgment motion that "pursuant to § 768.28(9), Corizon can only

be held liable for 'bad faith, malice, or . . . wanton and willful disregard' for

human life."  ECF No. 31 at 14-15 (citing FLA. STAT. § 768.28(9)).  Corizon

asserts that Count I is based only on medical negligence and does not rise

to the level of malice or wanton and willful conduct.  ECF No. 21 at 15.

That argument is incorrect, although Plaintiff does not dispute it.  *See*

ECF No. 32.  Rather, Plaintiff contends that "wanton and willful" conduct is

equal to "reckless conduct," which amounts to deliberate indifference.  *Id.*

at 10-11.  Plaintiff contends that "Corizon acted in bad faith" and thus,

argues that summary judgment is not appropriate.  *Id.* at 10-13.

This Court's reading of § 768.28(9) is at odds with the parties'

arguments.  That statute provides that "[n]o officer, employee, or agent of

the state . . . shall be held *personally liable . . .* for any injury or damage

suffered as a result of any act, event, or omission of action in the scope of

her or his employment or function, *unless* such officer, employee, or agent

acted in bad faith or with malicious purpose or in a manner exhibiting

wanton and willful disregard of human rights, safety, or property." FLA.

STAT. § 768.28(9)(a) (emphasis added).  That means an officer is held

personally liable if it is alleged that the officer "acted in bad faith or with

malicious purpose."  To be clear, the statute goes on to provide:

> The *exclusive remedy* for injury or damage suffered as a result
> of an act, event, or omission of an officer, employee, or agent
> of the state or any of its subdivisions or constitutional officers
> shall be by action against the governmental entity, or the head
> of such entity in her or his official capacity, or the constitutional
> officer of which the officer, employee, or agent is an employee,
> *unless such act or omission was committed in bad faith or with
> malicious purpose or in a manner exhibiting wanton and willful
> disregard of human rights, safety, or property*. The state or its
> subdivisions shall not be liable in tort for the acts or omissions
> of an officer, employee, or agent committed while acting outside
> the course and scope of her or his employment or committed in
> bad faith or with malicious purpose or in a manner exhibiting
> wanton and willful disregard of human rights, safety, or
> property.

FLA. STAT. § 768.28(9)(a) (emphasis added).  Thus, the state is not liable

for actions based on malice, bad faith, or with wanton and willful disregard

of human rights.  Debose v. Univ. of S. Fla., 178 F. Supp. 3d 1258, 1268

(M.D. Fla. 2016) (stating that "pleading malice 'will bar recovery against a

state agency pursuant to sovereign immunity under 768.28(9)(a).'"

(quotation omitted)).

Case No. 4:17cv05-WS/CAS

In this case, neither party has correctly interpreted this statute. Plaintiff did not allege malice or bad faith in the complaint, but essentially did so in response to the summary judgment motion.  For its part, Corizon has not shown it is entitled to summary judgment based on its argument that it "can only be held liable for 'bad faith, malice," and the like.  ECF No. 31 at 14.  Corizon has improperly argued that alleging "simple negligence" is "not sufficient to overcome Corizon's immunity as an agent of the State." ECF No. 34 at 8.

Those issues should be resolved by the wisdom of the state court. Doing so will also involve resolving Plaintiff's claim that under Florida sovereign immunity law, that defense is waived if not raised as an affirmative defense.  *See* ECF No. 32 at 9-10, ECF No. 34 at 6. Furthermore, still pending in this case is the vicarious liability claim brought against the Department of Corrections and the Department's counterclaim brought against Plaintiff.  All of those issues are based on state law.  There is no unfairness to the parties in having those claims resolved by the state court.  Accordingly, it is recommended that this case be remanded to the Circuit Court of the Second Judicial Circuit in and for Leon County, Florida

to resolve Counts I and II of the complaint and the counterclaim brought

against Plaintiff.

Accordingly, it is **ORDERED** that Plaintiff's motion for judicial notice,

ECF No. 33, is **DENIED**.

**RECOMMENDATION**

It is respectfully **RECOMMENDED** that the original motion for

summary judgment, ECF No. 28, be **DENIED as moot**, that the amended

motion for summary judgment, ECF No. 31, be **GRANTED** as to Count III,

and this case be **REMANDED** to state court for all further proceedings to

resolve the remaining issues of state law.

**IN CHAMBERS** at Tallahassee, Florida, on July 26, 2018.


S/     Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations.  Fed. R. Civ. P. 72(b)(2).  A copy of the objections shall be served upon all other parties.   A party may respond to another party's objections within**

fourteen (14) days after being served with a copy thereof.  Fed. R. Civ. P. 72(b)(2).  <u>Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control.</u>  If a party fails to object to the Magistrate Judge's findings or recommendations as to any particular claim or issue contained in this Report and Recommendation, that party waives the right to challenge on appeal the District Court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.